1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

SHAWN JULIAN MONTGOMERY,

           Petitioner,

    v.

R.T.C. GROUNDS,

           Respondent.

Case No. 1:14-CV-00927-LJO-SMS  HC

FINDINGS AND RECOMMENDATIONS
RECOMMENDING DENIAL
OF THE PETITION

       Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He contends that prejudicial error violated his Fifth, Sixth, and Fourteenth Amendment rights (1) when the expert witness on gang crime testified regarding Petitioner's specific actions, intent, and motivation rather than rendering an opinion in response to hypothetical questions; (2) when the trial court admitted photographs and a "gang roll call" in the course of the expert's testimony; (3) when counsel failed to object to prejudicial errors in the expert's testimony; and (4) when the trial court failed to include, on its own motion, an instruction of California Penal Code § 246.3 (grossly negligent discharge of a firearm) as a lesser include offense of California Penal Code § 246 (shooting of an occupied vehicle).  Having reviewed the petition, the record, and applicable law, the undersigned recommends that the Court deny the petition.

1

I.      **Procedural Background**[1]

On January 27, 2011, following trial in Fresno County Superior Court, a jury convicted

Petitioner of attempted murder (Cal. Penal Code[2] §§ 664 and 187(a)), shooting from a motor vehicle

(§ 12034(c)), shooting at an occupied motor vehicle (§ 246), possession of a firearm by a felon

(former Cal. Penal Code § 12021(a)(1), and active gang participation (§ 186.22(a)).  The jury also

found that Petitioner had committed the offenses for the benefit of, at the direction of, and in

association with a criminal street gang with the intent to promote, further, and assist the gang

(§ 186.22(b)(1)) and had personally discharged a firearm causing great bodily injury

(§ 12022.53(d)).  The trial court sentenced Petitioner to a determinate term of 10 years, 8 months'

imprisonment and a consecutive indeterminate term of imprisonment of 50 years to life.  As a result

of this judgment, Petitioner is currently in the custody of the California Department of Corrections

and Rehabilitation.

Petitioner filed a direct appeal to the California Court of Appeal, Fifth Appellate District,

which affirmed the judgment on March 18, 2013.  On June 19, 2013, the California Supreme Court

denied Petitioner's petition for review.

Petitioner filed the pending federal petition for habeas corpus on June 17, 2014.

II.     **Factual Background**[3]

On the evening of December 24, 2009, Rosalinda Villarreal and Jaime
Ponce, along with their children, were driving home from visiting Villarreal's
mother.  They were in a gray Chevy Tahoe, a sport utility vehicle (SUV).
Villarreal was driving, Ponce sat in the front passenger's seat, and the children sat
in back.  Around 11:30 p.m., they stopped at a Fastrip in Sanger to get gas.  The
Fastrip had a store and gas pumps on either side of the store.  As Villarreal pulled
into the Fastrip lot, a man stood in her way.  She waited for him to move and then
drove up to the gas pumps.  Ponce got out and pumped gas, while Villarreal
remained in the car with the children.  After he finished pumping gas, Ponce got
///

---

[1] The following information is derived from the pleadings in this case and from state court records lodged by Respondent with his response.
[2] All further statutory references are to the California Penal Code unless otherwise noted.
[3] The factual background, taken from the opinion of the state appellate court (*People v. Shawn Julian Montgomery*, F062094 (Cal. Ct. App. March 18, 2013) (Doc. 13-1)), is presumed correct.  28 U.S.C. § 2254(e)(1).

2

back into the SUV, and Villarreal asked if he had gotten the receipt.  He had not, so Ponce got out of the SUV to retrieve the receipt from the gas pump.

Ponce got the receipt from the gas pump and, as he walked around the SUV to get back to the passenger door, he heard five or six gunshots.  According to Villarreal, she saw a pearl white Mitsubishi Galant in front of her, about 14 feet from her SUV.  From the back passenger-side window of the Galant, a man "stuck his whole body out," and shot at the SUV.  The shooter had tattoos on both sides of his face and was the same man Villarreal had seen before she pulled up to the gas pumps.

Ponce saw that the passenger window of the SUV had shattered.  He felt his stomach getting warm and it became hard to breath[e], and Ponce realized he had been shot.  When the shots shattered the window of the SUV, Villarreal turned around to check on her children and saw that they were okay.  She could not see Ponce, so she opened her door and called for him.  Ponce responded that he had been shot, and Villarreal got out of the car.  She pulled up Ponce's shirt because he was holding his stomach with his hand, and she saw blood running down his legs.  Ponce was taken to the hospital, where he stayed from December 25 to December 31, 2009.  He had two surgeries as a result of his injuries.  At trial, the parties stipulated that Ponce had suffered great bodily injury as a result of being shot.

Villarreal described the shooter to the police as a Hispanic male with short hair, skinny, and with tattoos on both sides of his face.  The day after the shooting, Villarreal picked Montgomery's photograph out of a photographic lineup of six photos, and she identified him as the shooter at trial.  Ponce, however, did not see who had shot him that night.

The Fresno County District Attorney charged Montgomery with five counts: (1) attempted murder of Ponce (§ 664, 187, subd. (a)); (2) shooting from a motor vehicle (§ 12034, subd. (c)); (3) shooting at an occupied motor vehicle (§ 246); (4) possession of a firearm by a felon (former § 12021, subd. (a)(1)); and (5) active gang participation (§ 186.22, subd. (a)).  With respect to the first through third counts, it was alleged that the offense was committed for the benefit of the Chankla Bulldog criminal street gang (§ 186, subd. (b)(1)), and that Montgomery had personally and intentionally discharged a firearm causing great bodily injury to Ponce (§ 12022.53, subd. (d)).

A jury trial began on January 18, 2011.  Villarreal and Ponce testified about the shooting.  Ponce also testified that he had been associated with a gang, the Sanger South Side Sureños, from the time he was 13 years old until he was about 30, but he stopped associating with the gang in 2006.  He was not wearing anything to indicate he was a Sureño gang member and he had no visible gang tattoos.  Ponce did not know Montgomery, but agreed that in a small town like Sanger it would be common for gang members to recognize their rivals.  Ponce explained that Montgomery was younger than he was, and he did not know him because they were not in the same age group.

The prosecution presented two witnesses who placed Montgomery at the Fastrip on the night of the shooting. Kelley Shepherd testified that on the night of December 24, 2009, she asked her mother's roommate, Marcela Gonzales, for a ride to the store. Gonzalez took Shepherd to the Fastrip in her white Mitsubishi Galant. Montgomery, who was Gonzalez's boyfriend, went with them. Montgomery was introduced to Shepherd as "Sparky," and she did not know his real name. Before that night, Shepherd had seen Montgomery in passing but had not met him. Shepherd sat in the front passenger seat, Gonzalez drove, and Montgomery sat in the back seat on the right side. Shepherd, who had been drinking that day, and Gonzalez went inside the store to buy alcohol. As they went to the register to pay, they saw a television showing surveillance video of the parking lot and saw that Montgomery was not in Gonzalez's car and was walking around in the parking lot. Gonzalez went to the entrance of the store and told Montgomery to get back in the car. Shepherd saw a pickup truck pull up and Montgomery talked to someone in the truck.

Shepherd testified that she and Gonzalez completed their purchase and then went outside. Montgomery would not get in the car. He kept saying something about a scrap, "fuckin' scrap," and "he was just walking in circles, like he didn't know what to do, like he was confused . . . ." Shepherd and Gonzalez got in the car and were ready to leave Montgomery at the Fastrip. Finally, Montgomery got in the car as they were about to leave. He sat in the back seat directly behind Shepherd and did not say anything. Shepherd testified that they were stopped to pull out of the Fastrip when she heard loud gunshots. She heard Gonzalez say, "'What the fuck, Shawn,'" and Shepherd "knew it was him . . . . " Shepherd turned around and saw Montgomery with his arm out the window with a gun. He was pointing the gun at a gas pump where a blue SUV was parked. She thought she heard about four to six shots. After the shooting, Montgomery said he wanted to be dropped off in the Chankla, a neighborhood in Sanger.

Gonzalez also testified. In December 2009, she was renting a place at Shepherd's mother's house and dating Montgomery. Gonzalez confirmed Shepherd's testimony that she drove Shepherd and Montgomery to the Fastrip on the night of December 24, 2009, to buy alcohol. She drove an off-white Mitsubishi Galant. Gonzalez testified, however, that when she and Shepherd went into the store, Montgomery stayed in the car. When she left the store and got into her car, Montgomery was still inside, sitting in the back seat. When she was pulling out of the gas station, Gonzalez "heard gunshots from far away." She did not know what was going on and she did not look around to see where the shots were coming from. Gonzalez testified that she did not see Montgomery with a gun. She testified that she did not remember Montgomery yelling, "'What's up, Bulldog'" when the shots were fired. As will be seen, however, in a police interview that day after the shooting, she told police that Montgomery yelled, "'What's up, Bulldog?'"

Gonzalez drove home and asked Montgomery what was going on. She then switched cars and dropped Montgomery off at his home.

*///*

4

Sanger Police Officer Brandon Coles testified that he was on duty on December 24, 2009, and responded to a report of a shooting at the Fastrip. He reviewed video surveillance from the store's video cameras with another officer, Tom Reinhart. Reinhart recognized Shepherd from previous investigations, which he described as "[t]ruancy type, runaways, other investigations in the home." An address was located for Shepherd, and Coles and other police officers went to that address, which was Shepherd's mother's house. Gonzalez and Shepherd were both at the house, and they agreed to go to the police station to be interviewed. Coles observed a white Galant in the driveway that matched the car he had seen on the Fastrip surveillance video. In the back seat of the Galant, Coles found a notebook with photographs of Montgomery. On the first page of the notebook was written, "Marcie heart Shawn Montgomery."

On December 25, 2009, Coles interviewed Shepherd and Gonzalez at the police station, and their taped interviews were played for the jury. In her interview, Gonzalez acknowledged that Montgomery did not remain in the car while she and Shepherd were in the Fastrip store, and she told him to get back in the car. She told Coles, "And then when I looked over he was outside the car and I just told him, "Get inside the car, like, you don't need trouble. Just get inside the car.'" Gonzalez saw that an Avalanche truck pulled up and Montgomery talked to somebody. When she returned to her car from the store, she asked Montgomery who it was and he said it was Johnnie. After Gonzalez told him to get in the car, Montgomery "flipped [her] off," and she had "a feeling it's gonna go bad." As Gonzalez drove out of the Fastrip lot, Montgomery yelled out, "'What's up, Bulldog?'" and the shots started firing. Gonzalez turned around and Montgomery's "whole front side" was outside the window of the car. She drove home and then used her roommate's car to drop Montgomery off.

In Shepherd's interview, she described seeing Montgomery talking to someone in a truck. "Shawn was talking with this truck, there was um, a truck and that guy in the truck was saying, 'Yeah, it's a scrap but, be cool dog.'"

Andrew Simonson of the Fresno County Sheriff's Department testified as "an expert on the area of the Chankla criminal street gang." Simonson worked for the Multi-Agency Gang Enforcement Consortium, assigned to the City of Sanger and the Bulldog criminal street gang. Simonson explained that Sanger has three gangs: the Olivo Street Bulldogs, the Chankla Bulldogs, and the Sanger Sureños. The Chankla Bulldogs identify with the color red, the Fresno State logo, and the bulldog. They also go by "VCKL" and "Varrio Chankla," and common tattoos associated with the gang are "VCKL," dog paws, dog collars, and "CKL." The Chankla Bulldogs are part of the overall Bulldog gang, which is a criminal street gang specific to Fresno County. They get along with most subsets of the Bulldogs, except the Olivo Street Bulldogs, who are their rivals. The Sanger Sureños are rivals of all Bulldogs, including the Chankla Bulldogs. Simonson testified that the Chankla Bulldogs had approximately 110 members.

Simonson discussed several predicate offenses committed by Chankla Bulldog gang members. In one of the offenses, Johnny Valencia, a Chankla

5

Bulldog gang member, stabbed a victim whom he believed was a rival Sanger Sureño.  Right before the attack, Valencia said, "'What up, dog?'"  In another case, two Chankla Bulldog gang members, Nestor Retamoza and Frank Subia, chased down a victim and stabbed him several times.  Simonson testified that the primary activities of the Chankla Bulldogs are possession of dangerous weapons, drive-by shootings, and assaults.

Simonson reviewed police reports and other documents related to Montgomery and put together a gang report.  He explained that the sheriff's department uses a 10-point criteria system to determine whether someone is a gang member.  These points include having gang tattoos, admitting gang membership to police, and being contacted by police while in the company of known gang members.  In addition, jail classification—when a person admits to jail custody staff that he is a gang member—is a stand-alone criterion for determining gang membership.  Simonson found that Montgomery met all 10 points and the separate criterion of jail classification.  There were 13 documented instances of Montgomery being booked into Fresno County jail and admitting he was a Chankla Bulldog, spanning from 2001 to 2009.  Simonson also had documentation of Montgomery associating with Subia and Valencia.

Simonson's gang report included several photographs.  He testified that some photos were seized from Subia in a search related to the investigation of the stabbing by Retamoza and Subia and others were found on a Myspace website.  Other photos appear to have been taken during police contacts.  Some of the photographs showed Montgomery's tattoos on his front torso, face, back of the head, neck, and back.  Montgomery had a "C" on the right side of his face, "Chankla" on his forehead, "VCKL" below his right eye, "BD" (for Bulldog) on his chin, "FC" with a bulldog on his left cheek, a large bulldog on his chest with "VCKL" underneath, and a handgun on his right side, among other tattoos.  Other photos showed Montgomery with known gang members.  For example, in one photograph, he is shown wearing a red bandana and another gang member "is throwing a hand sign 'C' for Chankla."

The gang report also included a "roll call" listing members of the Chankla Bulldogs by their monikers.  Simonson explained that roll calls are sometimes painted on alleys, but this roll call was taken in a search of Subia's house.  "Sparky," which is Montgomery's moniker, appeared on the roll call.  The photographs and roll call were part of the basis for Simonson's opinion in this case.

Simonson gave his opinion that Montgomery was an active participant in the Chankla Bulldogs, explaining, "He currently continues to associate with other Chankla Bulldogs and he continues to represent his allegiance through more and more gang-related tattoos."  Asked about where Montgomery ranked among respected, feared, and notorious gang members, Simonson responded, "I'd say he's the most influential member of the Chankla Bulldogs that is not in Department of Corrections custody."

6

The prosecutor then asked Simonson if there were "any facts about the present case that stood out to [him]." Simonson testified that identifying a rival gang member by the term "scrap" and identifying his gang by saying "Bulldog" before the attack stood out to him. Simon explained that "scrap" was a derogatory term used to refer to the Sureños. Saying "What's up, Bulldog?" was significant because "[i]t's claiming ownership that he is, in fact, a Bulldog."

Simonson agreed that a gang member can earn respect from his gang and from rivals by committing a violent act and that a gang member who shoots a rival or perceived rival would gain respect for himself and bolster the reputation of his gang. Finally, Simonson opined that Montgomery's actions in this case benefited the Chankla Bulldogs as it "bolstered his status as someone that is willing to—to do a violent crime for his gang."

The defense presented alibi evidence for Montgomery. Hilda Reyna lived with her mother and other relatives in the area of Sanger known as the Chankla. On December 24, 2009, which was her mother's birthday as well as Christmas Eve, the family had a bonfire in the backyard and friends and family visited. Reyna testified that she had known Montgomery for a few years and he spent the night at her house. He arrived some time between 5:00 and 6:00 p.m. and stayed until the next day. Specifically, around 11:00 p.m. until midnight, Montgomery was at her house; they were in the backyard drinking. Reyna testified that she was not Montgomery's girlfriend and she knew he had a girlfriend named Marcie.

Reyna also testified that she knew John Munoz. He has a big "C" tattooed on his cheek, and in December of 2009 his hair was short.[4] A photograph of Munoz together with Montgomery was admitted into evidence. Reyna admitted that some of her family are considered to be associated with the Chankla Bulldogs. Her younger brother was an active member of the Chankla Bulldogs and was killed by rival Sureño gang members.

Reyna's mother, Maria Rita Perales, also testified about December 24, 2009. Perales had known Montgomery for six or seven years and he lived about a half a block down the street from her house. She recalled that Montgomery came to her house around 4:30 or 5:00 p.m. Montgomery arrived with Perale's son, Johnny Reyna, and they went to the backyard. Perales did not hang out in the backyard that night. She stayed in the house with her daughter-in-law and grandchildren and they cleaned the kitchen and watched television. She saw Montgomery in the backyard with her son at around 2:30 a.m. on December 25, 2009. He was still at her house in the morning when she woke up. Perales testified that her son Johnny was later killed, and she was told that he had been killed by a Sureño gang member.

The defense also called Isabel Fimbres. She was at the Fastrip on December 24, 2009, and she saw the drive-by shooting. She had stopped to get

---

[4] The "C" tattoo was significant because, when police officers interviewed Villarreal soon after the shooting, she described the shooter as having a "C" on one of his cheeks. She also described writing on the forehead and other cheek. One of the officers who spoke to Villarreal, Sanger Police Officer Kevin Callahan, testified that he was familiar with two people with "C" face tattoos—Montgomery and Munoz.

gas and was parked next to the person who was shot. She sat in the driver's seat of her car, while her friend got out and paid and pumped gas. She heard some arguing and some girls saying something like, "'Hey, get in the car, get in the car.'" A couple minutes later, Fimbres was texting on her phone when she heard shots. She looked up and saw, to her left, a small car and a person in the passenger seat shooting. Fimbres testified, "I just saw a sleeve and I saw the arm and the guy pulling the trigger several times . . . ." The shooter was aiming at a big SUV next to her. After the shooting stopped, she saw "like a lot of gunshots on the car" and children crying.

A couple weeks after the shooting, Fimbres went to the police station. She was shown a photographic lineup that included a photograph of Montgomery, but she picked another photograph. The person she identified did not have tattoos all over his face. Fimbres testified that she did not see the shooter's face very well, explaining "It was just mostly . . . his arm and the gun that I saw." She chose the photo based on the hair and the fact he was skinny. She was "not really confident" that she had identified the right person because she did not see the shooter's face clearly. Fimbres agreed that if she had seen tattoos like Montgomery's, she would have remembered them.

The prosecution recalled Simonson to address the photograph that Fimbres had picked out of the photographic lineup. He testified that the photograph Fimbres had identified was of a person who had been confined at a state mental hospital since July 2008 to the present and therefore could not have committed the crime.

Doc. 13-1 at 2-10.

## III. Jurisdiction

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). Petitioner contends that he suffered violations of rights guaranteed to him by the U.S. Constitution. The challenged conviction occurred in Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a).

On April 24, 1996, Congress enacted AEDPA, which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Because Petitioner filed his petition after April 24, 1996, it is governed by AEDPA's provisions.

///

8

**IV.**     **Standard of Review**

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.*  Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved

*///*

9

an unreasonable application of, United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

The AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Harrington*, 562 U.S. at 102.  "A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Put another way, a federal court may grant habeas relief only when the state court's application of Supreme Court precedent was objectively unreasonable and no fair-minded jurist could disagree that the state court's decision conflicted with Supreme Court's precedent.  *Williams*, 529 U.S. at 411.

V.      **Discussion**

A.      **Claim One: Admission of Expert Testimony**

The first three claims arise from the testimony of Andrew Simonson, a Fresno County Sheriff's Deputy and member of the Multi-Agency Gang Enforcement Consortium ("MAGEC").  In the first claim, Petitioner contends that his rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution were violated by Simonson's testimony that Petitioner was a member of the Chankla Bulldog gang and that Petitioner shot Ponce to benefit the gang.  Petitioner's brief addresses the substance of this claim, repeating the arguments that he advanced in his state appeal, but does not address whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  As Respondent points out, the omission does not matter.  Because the state court

10

held that Petitioner forfeited this claim through failure to object at trial, it was procedurally defaulted.

Citing *People v. Roberts*, 184 Cal.App.4th 1149, 1193 (2010), the California Court of Appeal[5] held that since Petitioner's trial counsel failed to object to any of the prosecutor's questions or Simonson's responses, Petitioner forfeited the issue on appeal.  Federal habeas review of a claim is barred when a state prisoner defaulted on his claim in state court pursuant to the state's adequate and independent procedural rule.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To preclude federal review, the state court must have clearly and expressly disposed of the claim based on a procedural bar.  *Harris v. Reed*, 489 U.S. 255, 261-62 (1989).  The state court did so here.

Under California Evidence Code § 353, commonly referred to as the "contemporaneous objection rule," evidence is admissible unless there is an objection that has been clearly expressed and made when the evidence was introduced.  *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002).  In accordance with longstanding California law, the Court of Appeals held that because Petitioner did not object to the relevant portions of Simonson's testimony at trial, he forfeited the right to appeal the prosecutor's questions and Simonson's responses.  Doc. 13-1 at 11-12.

"When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court."  *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).  "[T]he failure of a habeas petitioner to observe a state's 'contemporaneous objection' rule results in a procedural default which precludes litigation of the alleged error in federal court."  *Hines v. Enomoto*, 658 F.2d 667, 673 (9th Cir. 1981), *overruled on other grounds*, *Ross v. Oklahoma*, 487 U.S. 81 (1988).  Federal habeas review may occur only when a petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of

---

[5] When the state's highest court denies a petition for review, as the California Supreme Court did in this case, a federal court reviewing a habeas petition must "look through" to the last reasoned decision of the intermediate appellate court and apply AEDPA to that decision.  *See Williams v. Cavazos*, 646 F.3d 626, 636 (9th Cir. 2011), *reversed on other grounds sub nom. Johnson v. Williams*, 133 S.Ct. 1088 (2013).

justice." *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999) (quoting *Coleman*, 501 U.S. at 750).  As previously noted, Petitioner argues the substantive merits of his evidentiary claim but does not address the standards of review of habeas petitions or the elements of cause and prejudice.

"[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  "Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial . . . . But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure." *Id.* at 68 (quoting *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)).

"It is 'well-established . . . . that expert testimony concerning an ultimate issue is not per se improper.'" *Moses v. Payne* 555 F.3d 742, 761 (9th Cir. 2009) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).  Although an expert witness may not directly opine regarding a defendant's guilt or innocence, he may testify regarding an ultimate issue to be resolved by the trier of fact.  *Moses*, 555 F.3d at 761.  For example, an expert medical examiner may opine that a victim died as a result of homicide.  *Id.*  In any event, the U.S. Supreme Court has not addressed the constitutionality of an expert's offering an opinion on an ultimate fact. *Id.*  Since the state appellate court's disposition of Petitioner's appeal was not contrary to or an unreasonable application of Supreme Court precedent, a federal district court may not grant the writ based on Simonson's opining on an ultimate fact.

**B.   Claim Two: Admission of Photographs and Gang Roll Call**

Petitioner next contends that the trial court committed prejudicial error by admitting photographs and the "gang roll call" to which Simonson testified.  The analysis of this claim does not differ from that of claim one.  The Court of Appeals held that because Petitioner's attorney did

1   not object to admission of the photographs or the gang roll call at trial, Petitioner had forfeited the

2   claim on appeal.  As addressed in detail in claim one, federal habeas review of a claim is barred

3   when a state prisoner defaulted on his claim in state court pursuant to the state's adequate and

4   independent procedural rule.  *Coleman*, 501 U.S. at 750.

5          Issues regarding the admission of evidence are matters of state law, generally outside the

6   purview of a federal habeas court.  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  "The

7   admission of evidence does not provide a basis for habeas relief unless it rendered the trial

8   fundamentally unfair in violation of due process."  *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir.

9   1995).  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned

10  review of the wisdom of state evidentiary rules."  *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6

11  (1983).  "Although the [U.S. Supreme] Court has been clear that a writ should be issued when

12  constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375 . . .,

13  it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

14  constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley*, 568 F.3d at

15  1101.  Since the state appellate court's disposition of Petitioner's appeal was not contrary to or an

16  unreasonable application of Supreme Court precedent, a federal district court may not grant the writ

17  based on the trial court's admission of the photographs and gang roll call.

18      **C.      Claim Three: Ineffective Assistance of Trial Counsel**

19          His first two claims being barred under the contemporaneous objection rule, Petitioner

20  contends that his trial counsel's failure to object to Simonson's testimony and to the admission of the

21  photographs and gang roll call constituted ineffective assistance of counsel.  Again, petitioner fails to

22  address the standard of review applicable in a federal habeas action, seeking instead to have this

23  Court substantively re-analyze the issue of ineffective assistance of counsel.  The Court of Appeals

24  analyzed counsel performance with regard to each of the first two issues (Simonson's testimony and

///

the admission of the photographs and gang roll call) and concluded that because Petitioner could not establish prejudice, he could not prevail on a claim of ineffective assistance of counsel.

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorneys' representation was deficient and (2) prejudice. Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

The Court of Appeals found it likely that trial counsel had declined to object to Simonson's testimony and the admission of the photographs and gang roll call as a matter of trial strategy. Forcing the prosecution to restate its questions as hypothetical questions would have resulted in repetition of incriminating facts; objecting to the photographs and roll call would likely have resulted in multiple witnesses repeating and re-emphasizing incriminating facts in the process of authentication.   The court premised its decision solely on Petitioner's inability to demonstrate prejudice, however.

14

With regard to Simonson's testimony, the Court of Appeals held that Petitioner failed to establish prejudice in light of the facts of the case:

> The evidence showed that Ponce had been a Sureño gang member for 17 years, and Montgomery had tattoos all over his face and body and had identified himself as a Chankla Bulldog to jail staff 13 times. Before the shooting, Shepherd heard Montgomery say "fuckin' scrap" and heard another man say "Yeah, it's a scrap but, but be cool dog." Gonzalez heard Montgomery yell, "What's up, Bulldog?" right before the shots started firing. Shepherd saw Montgomery with his arm out of the car window, pointing the gun at a gas pump where an SUV was parked. Villarreal identified Montgomery as the shooter. Given the evidence, it is not reasonably probable that the result would have been more favorable to Montgomery if defense counsel had objected and Simonson had offered his opinions only in response to hypothetical questions.

Doc. 13-1 at 14-15.

Similarly, with regard to the photographs and gang roll call, the Court of Appeals concluded:

> Even without the photographs, Montgomery's tattoos could be seen on his face. Without the gang roll call, there was still Simonson's testimony that Montgomery had admitted to being a Chankla Bulldog to jail staff 13 times. Reyna testified that her younger brother, Johnny, was an active member of the Chankla Bulldogs and was killed by rival gang members. Perales testified that Montgomery arrived at her house on Christmas Eve 2009 with Johnny. In light of the overwhelming evidence of Montgomery's gang ties, it is not reasonably probable that the outcome would have been different if defense counsel had objected to the photographs and roll call.

Doc. 13-1 at 16.

When a petitioner challenges a state court's application of governing federal law, such as the *Strickland* test, he must demonstrate that the Court's action was not only erroneous, but objectively unreasonable. *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003). In this case, Petitioner fails to carry his burden, arguing only that his trial attorney erred and failing to address the Court of Appeals' action in any way. Because the state court's application of U.S. Supreme Court precedent was objectively reasonable and no fair-minded jurist could disagree that the state court's decision conflicted with Supreme Court's precedent, this Court may not grant the writ based on ineffective assistance of counsel.

///

15

### D.       <u>Claim Four: Sua Sponte Jury Instruction</u>

Finally, Petitioner claims that the trial court, on its own motion, had the duty to instruct the

jury on grossly negligent discharge of a firearm (§ 246.3) as a lesser-included offense of shooting at

an occupied vehicle (§ 246).

Section 246, a felony, proscribes malicious and willful shooting of a firearm at an occupied

motor vehicle.  Section 246.3, a public offense, proscribes the willful discharge of a firearm in a

grossly negligent manner which could result in injury or death of another person.  Section 246.3 is a

necessary lesser included offense of § 246.  *People v. Overman*, 126 Cal.App.4th 1344, 1358 (2005).

Under California law, a trial court must give instructions on lesser included offenses on its own

motion "when there is substantial evidence that the lesser offense, but not the greater, was

committed."  *Id.*  The Court of Appeals reviewed this issue, ultimately concluding that substantial

evidence did not support a theory that Petitioner was guilty of the lesser-included offense:

> It is not the rule that "any evidence, no matter how weak" justifies instructions on
> a lesser-included offense.  ([*People v.*] *Beverman*,[19 Cal.4th 142, 162 (1998)].)
> In this case, there was no evidence that Montgomery discharged a firearm in a
> grossly negligent manner, but did not maliciously and willfully shoot at or in
> close proximity to Ponce and Villarreal's SUV—which was occupied at the time
> by Villarreal and her four children.  Villarreal testified that Montgomery shot at
> the SUV.  Shepherd testified that Montgomery was pointing the gun at a gas
> pump where a blue SUV was parked.  Fimbres testified that the shooter was
> aiming at the big SUV that was next to her.  Gonzales testified that, when she
> heard the shots, she did not know what was going on.  There was nothing in
> Gonzalez's testimony to suggest that Montgomery fired shots, but he did not shoot
> at or in close proximity to the SUV.  There was evidence at trial (Reyna's
> testimony) that Montgomery was not the shooter, but there was no substantial
> evidence that the shooter was not aiming at Ponce and his SUV.

Doc. 13-1 at 18.

In any event, said the Court of Appeals, the failure to instruct the jury on § 246.3 was

harmless.  Because the jury also found Petitioner guilty of attempted murder of Ponce and imposed

the firearm-enhancement, the jury had to have concluded that Petitioner had intended to kill Ponce

and that he personally and intentionally discharged the firearm that shot Ponce, causing great bodily

injury.  The Fastrip surveillance video and Ponce's testimony established that Ponce was close to the vehicle, traveling from the gas pump to the passenger door when he was shot.  Accordingly, the Court of Appeals concluded that the jury's finding Ponce not guilty of violating § 246 was not reasonably probable.

"[T]he failure . . . to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."  *Messer v. Runnels*, 329 Fed.Appx. 102, 104 (9th Cir. 2009) (quoting *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998)).  Accordingly, this issue does not give rise to potential habeas relief under 28 U.S.C. § 2254 because it does not allege a claim that Petitioner's custody violates the Constitution or laws or treaties of the United States.

## VI.    Conclusion

For the above reasons, the undersigned recommends that the Court DENY the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

These findings and recommendations are submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, either party may file written objections with the Court, serving a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __March 11, 2015__          _____ **/s/ Sandra M. Snyder** ___
                                                         UNITED STATES MAGISTRATE JUDGE

17